UNITED STATES OF AMERICA
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | Case No. 3:14-00062 |
| | ) | Judge Sharp |
| TANNER BUCHANAN | ) | |

**MEMORANDUM**

Defendant Tanner Buchanan's involvement in an automobile accident ultimately led to his being indicted for receiving and possessing unlawful incendiary devices, specifically Molotov Cocktails, in violation of 26 U.S.C. § 5841, 5861(d) and 5871. Now pending before the Court is his Motion to Suppress Evidence and Statements (Docket No. 20).

On October 8 and November 14, 2014, the Court held an evidentiary hearing on Defendant's Motion, at the conclusion of which the parties were provided the opportunity to submit post-hearing briefs. They did so on December 19, 2014.

For the reasons that follow, Defendant's Motion will be denied.

**I. FACTUAL FINDINGS**[1]

Shortly after 9:00 p.m. on December 28, 2013, Officer Connie Cassidy of the Hendersonville Police Department was dispatched to the scene of an automobile accident on Vietnam Veterans Boulevard in Hendersonville, Tennessee. Upon arriving on the scene, Officer Cassidy observed two

---

[1] The following findings are drawn from the testimony of the witnesses at the suppression hearing, after considering their interests and demeanor. These facts are also drawn from the exhibits received in the evidence, including audio and visual recording of Defendant's interactions with police officers on the night in question. Because these are the Court's findings, any contrary testimony on a specific matter has been rejected in favor of the specific fact found.

1

vehicles on the shoulder of the road. The collision was minor, the cars were not disabled, and Officer Cassidy's initial impression was that the drivers would be allowed to leave once she completed her investigation and made a report.

After parking her squad car, Officer Cassidy approached the drivers, who were standing in the rain outside of their vehicles. The driver of the first car told her that the driver of the second vehicle (Defendant) had run into her car.

At some point shortly after she arrived on the scene, Officer Cassidy activated the video recorder in her squad car, which also activated a microphone both on her person and in her car. The driver of the first car was told that she was free to leave. However, because Officer Cassidy had observed that Defendant's eyes were "glassy" and "watery," she informed Defendant that he would be subjected to a field sobriety test. It was during this period that Officer Zachary Hampton arrived on scene as a back-up officer.

At approximately 9:20 p.m., Defendant, who was now sitting in his vehicle, was asked by Officer Cassidy to exit his vehicle. When making that request, Officer Cassidy noticed a knife lying on the seat next to Defendant and told him to leave it in the car.

Once out of the vehicle, Defendant was informed that he would be tested for sobriety, and was told the manner in which the test would be conducted. Defendant was told that, for the first test, he was to start with his feet together and his hands down by his sides and then, when instructed to begin, he was to raise his arms to the side and touch his nose with the tips of his index fingers. After receiving those instructions, Defendant asked if he was supposed to start with his hands down and was told yes. He then attempted to perform the test but was unsuccessful.

Defendant was next told that he would be tested utilizing the "one-leg" stand. Under this

test, Defendant was to lift either leg, hold the position, and then count 1001, 1002, 1003, etcetera. Defendant told Officer Cassidy he had a problem with one of his legs and was informed he could either stand on his bad leg or lift his bad leg, whichever he preferred. Defendant began the test, but as he approached "1015," he tipped to the side, failing this test as well.

The third and final test consisted of walking heel-to-toe on an imaginary line. Defendant asked Officer Cassidy if he could perform the test in the gravel next to the pavement. After being given permission to perform the test on the shoulder of the road, Defendant attempted to walk the line but was unsteady and "wobbly." By the second step he tipped to the side and had to catch himself from falling. Defendant failed this test as well.

Having failed the field sobriety test, Defendant was asked to walk over to Officer Cassidy's vehicle. He was then instructed to turn around and was placed in handcuffs. Defendant was told that he was under arrest for driving under the influence.[2] Defendant was also told that he performed very poorly on the tests but would be allowed to submit to a blood test. Defendant replied, "I'm sorry, I'm just not coordinated."

Upon his arrest, Defendant was searched and then placed in Officer Cassidy's vehicle. Around 9:30 p.m., he was asked if there was someone who could get his vehicle. Defendant gave Officer Cassidy his father's telephone number. Officer Cassidy asked dispatch to call the father and Defendant's father indicated that he would come and get the car.

Officer Cassidy then exited her vehicle and searched through Defendant's wallet, which had been left on the hood of her car. In it, she found a "probation card" which listed the name and

---

[2] The arrest occurred approximately ten minutes after Officer Cassidy arrived on the scene of the accident.

3

number of a probation officer.

Officer Cassidy got back into her vehicle and asked Defendant if there was anything illegal or of value in his car, to which he responded "no." She also asked if he had been "in trouble" before. Defendant said that he had been in trouble for "weed," claiming the amount involved was two grams. Shortly thereafter, Officer Hampton told Officer Cassidy that he was going to search Defendant's vehicle. Officer Cassidy told him to search it "good" because Defendant had previously been in trouble for "weed."

Officer Cassidy continued to speak with Defendant in her car. She asked the Defendant his age, to which he responded, "20," and asked him if he understood that marijuana would be discovered in a blood test. She also described Tennessee's implied consent law and told him that if he did not submit to a blood test, his license would be suspended for a year. Defendant asked her to explain the law again. After Officer Cassidy did so, Defendant refused a blood test.

While Officer Cassidy was conversing with Defendant, Officer Hampton began a search of Defendant's vehicle. Both officers testified at the suppression hearing that the search was conducted pursuant to the Hendersonville Police Department's inventory policy which required that the interior of a vehicle be searched prior to it being turned over to third party or a towing company. Both officers also testified that they had been briefed on the policy and had read and reviewed the policy prior to the stop at issue.[3]

Officer Cassidy testified that a "search of the car is a thorough look inside the vehicle to

---

[3] Officer Cassidy testified that the policy, which is dated March 15, 2011, was not modified between 2011 and 2014. For his part, Officer Hampton was more equivocal. He testified that he learned of the policy shortly after his hire in 2008 and believed it had not been changed. He later stated, however, that he believed the policy had changed since his hire, but that he would have been trained on any changes in the policy. This discrepancy does not change the fact that the search was conducted pursuant to the then-applicable policy.

basically see whatever you can find as far as weapons, drugs, paraphernalia, anything along that line," while "[a]n inventory of the vehicle is to identify everything in the car for our protection because we're going to release that vehicle to a third party or to a towing company." (Docket No. 27 at 30). Under questioning by the Court, however, Officer Cassidy conceded that she was "pretty much" doing the some thing just for a different reason. (Id.).

As Officer Hampton was searching the back seat area of Defendant's vehicle, he observed two backpacks. The first backpack was brown and contained a Sony Vaio laptop. When Officer Hampton moved the backpack he immediately detected what appeared to be the smell of marijuana coming from the bag. Upon further exploration, he discovered a knife with a scabbard. He also discovered a small plastic baggie containing a green leafy substance resembling marijuana in the front pocket of the backpack. He shared his discovery with Officer Cassidy who took it back to her car and displayed it before the in-car camera. Officer Cassidy asked Defendant if he had any more marijuana and explained to him that it was illegal to take drugs into the jail. Defendant responded that he had no more drugs on him or in his car.

After discovering what appeared to be marijuana, Officer Hampton retrieved a white mask that he had noticed earlier while looking through the windows of the vehicle. The mask was lying face down on the floorboard behind the front passenger seat. Officer Hampton picked up the mask, turned it over and placed it on the backseat.

Officer Hampton testified that he recognized the mask to be a "Guy Fawkes" mask which had been featured in a movie titled "V for Vendetta" and had recently been in the news. He also understood that the mask was used by members of the "hacktivist" group Anonymous.

The second backpack was blue and was located behind the driver's seat of the car. Officer

Hampton opened the bag and saw a glass bottle standing upright, with duct tape and a red rag sticking out of the top.[4] Officer Hampton believed it to be a Molotov Cocktail.

Officer Hampton also discovered lighter fluid, matches and lighters during the search. Based on those discoveries and the possible connection to Anonymous, he believed that "this could be more than someone making explosives in their garage," and he "was concerned for the safety of the public at that point." (Docket No. 33 at 12).

After the discovery of the items in the blue backpack, Officer Cassidy approached Defendant's vehicle and looked inside. Upon seeing the devices she exclaimed, "Oh my god."

At that point, approximately 9:46, the officers decided that it was unsafe to continue the search and police supervisors were called to the scene. Eventually, the bomb squad and firefighters also arrived.

Officer Cassidy returned to her vehicle and asked Defendant about the devices found in the blue backpack. Defendant stated that they were for his own protection and that "when everything goes to shit, I'm going to be prepared." (Id. at 46). She also asked if there were any items of concern in the trunk. Defendant replied in the negative.

Officer Cassidy then asked Defendant several biographical questions, such as his age, social security number, phone number, and occupation. Defendant correctly answered those questions.

Detective Jeffrey Brewer was the first supervisor to arrive. He was generally familiar with the group Anonymous and, while he had never before conducted an investigation involving a Molotov Cocktail, he recognized the device based upon his prior military experience which included

---

[4] Thereafter, another similar bottle was also found in the car, although it is unclear from the record who made the discovery.

a combat deployment in Iraq. Detective Brewer assumed control of the scene, spoke with Officer Cassidy, and took several photographs.

By this point, Defendant's father had also arrived. He was informed that the car would not be released to him because a Molotov Cocktail had been found inside. Instead, the vehicle was released to the criminal investigation division and driven to the police station by a detective.[5]

Defendant was driven to the police station. During transport, Defendant made no statements.

At the station, Defendant was taken into an interview room where he met with Detective Brewer. Detective Brewer asked Defendant whether he had had anything to drink or smoke, or whether he had taken any pills. He also asked Defendant several routine questions, such as his birth date, where he worked, how long he worked there, and what he did. Defendant responded to all of the questions.

Approximately four minute into the interview, Defendant was asked if he had been previously arrested and he conceded that he had been arrested on a marijuana charge. Defendant was then read the Miranda[6] warnings. Defendant acknowledged that he understood his rights, but stated that the portion about "anything can and will be used against him" kind of "freaked" him out. Nevertheless, Defendant agreed to talk to Detective Brewer.

When asked about the Molotov Cocktails, Defendant stated that the dark bottle contained gasoline and styrofoam, while the light bottle contained lacquer thinner and styrofoam. Defendant also stated that a rag stuck out of each bottle and match heads were taped around the top. In

---

[5] Officer Hampton could not recall whether he had written down the items he found as he was conducting the search. He stated, however, that he did not complete the official inventory; that was done by a detective at the police station. A few days later, the vehicle was released to Defendant's father.

[6] Miranda v. Arizona, 384 U.S. 436 (1966).

response to questioning, Defendant acknowledged that he lived with his parents. He indicated that there were fourteen devices located on the shelf in the closet of his bedroom, most of which contained gasoline, and two or three of which contained lacquer. When asked if there were any booby-traps around the devices, Defendant stated that he was "not fucking crazy."

After Detective Brewer called his Sergeant to tell him about the existence of the devices at the home, Defendant asked, "does this entail a lot of jail time?", to which Detective Brewer responded that he did not know. Defendant was asked the reason for the Molotov Cocktails and he stated that he was "prepping" for the end of the world. Defendant then stated that the only other thing that he had was a machete, but he did "not have a gun or anything." He also stated that he made his first Molotov Cocktail about two weeks before December 21, 2012, which was the end of the Mayan calendar.

As for the mask, Defendant told Detective Brewer that it was related to the Anonymous group. Although Defendant claimed he was not a member of the group and had no contact with it, he followed the group on Twitter and "liked their standpoint." He stated that the laptop found in the brown backpack had nothing to do with Anonymous, and that he had nothing to do with hacking.

When asked whether he had a problem with officers going to his house to search his room and retrieve the devices in the closet, Defendant shook his head, but asked that his dad be called first. Defendant signed a "Voluntary Consent to Search" form for his residence.

Officers went to Defendant's residence where (as noted) he lived with his parents. Defendant's father, John H. Buchanan, III, testified that he was not presented with a consent to search form, but was asked by officers if they could search the premises because his son had said that Molotov Cocktails were in the house. Mr. Buchanan told the officers "go get them" because

8

he did not "want anything like that inside of a log house, particularly[.]" (Docket No. 33 at 88).[7]
Defendant's parents were told to leave the premises and drive down to the end of the road while the search occurred. Approximately twelve Molotov Cocktails were discovered in a container in Defendant's bedroom.

## II. APPLICATION OF LAW

In his post-hearing brief, Defendant argues that the evidence collected against him and the statements he made on December 28, 2013, should be suppressed for two reasons:

> First, the Hendersonville Police Department's protocol for conducting so-called inventory searches is dramatically overly broad, and officers did not follow that policy in any event. Second, officers elicited incriminating statements while Mr. Buchanan was facing custodial interrogation.

(Docket No. 36 at 7). The Court considers those issues in turn.

### A. Inventory Search

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. "Nevertheless, because the ultimate touchstone of the Fourth Amendment is 'reasonableness,' the warrant requirement is subject to certain exceptions." Brigham City, Utah v. Stuart, 547 U.S. 398, 404 (2006) (citing Flippo v. West Virginia, 528 U.S. 11, 13 (1999)).

"'[I]nventory searches are now a well-defined exception to the warrant requirement of the Fourth Amendment.'" United States v. Hockenberry, 730 F.3d 645, 658 (6th Cir. 2013) (quoting Colorado v. Bertine, 479 U.S. 367, 371 (1987)). The "routine practice of securing and inventorying the automobiles' contents" when vehicles are impounded was "developed in response to three

---

[7] The police officers were armed and included members of the SWAT team. No guns were drawn, however.

distinct needs: the protection of the owner's property while it remains in police custody . . . ; the protection of the police against claims or disputes over lost or stolen property . . . ; and the protection of the police from potential danger[.]" South Dakota v. Opperman, 428 U.S. 364, 369-71 (1976). Such searches "are not subject to the warrant requirement because they are conducted by the government as part of a 'community caretaking' function, 'totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.'" Bertine, 479 U.S. at 381 (quoting Cady v. Dombrowski, 413 U.S. 433, 441 (1973)).

In this case, Officer Cassidy and Officer Hampton both testified that the search of Defendant's vehicle was an inventory search pursuant to the written policy of the Hendersonville Police Department. That policy cites the Supreme Court's decisions in Carroll v. United States, 267 U.S. 132 (1925) and Arizona v. Gant, 556 U.S. 332 (2009), and, immediately after the latter, provides:

> Police may search the passenger compartment of a vehicle, incident to a recent occupant's arrest, **ONLY** if it is reasonable to believe that the arrestee might access the vehicle at the time of the search **OR** that the vehicle contains **evidence of the offense of arrest**.
>
> **4.6.4 INVENTORY REQUIRED**
>
> **The HPD retains the policy requirement that any automobile ordered towed by HPD employee, or released to a third party, must be fully inventoried prior to release.**
>
> > 1. Inventories must be thorough, to include all locked containers that might contain valuables to be protected by inventory.
> >
> > 2. Detailed inventory must be written on each inventory/release document for any auto so towed or released.
>
> **An inventory is not a search. Articulate the differences in your warrants, reports, and court testimony.**

(Govt. Exh. 1, bold and underline in original).

The Court credits the officers' testimony and finds that the search of Defendant's vehicle was conducted pursuant to the department's inventory search policy. The Court does so notwithstanding Officer Cassidy's statement to Officer Hampton that he should search "good" in light of the fact that Defendant was apparently on probation for a marijuana violation.

"In order to be deemed valid, an inventory search may not be undertaken 'for purposes of investigation,' and it must be conducted 'according to standard police procedures.'" United States v. Smith, 510 F.3d 641, 650 (6th Cir. 2007) (quoting United States v. Lumpkin, 159 F.3d 983, 987 (6th Cir. 1998)). "[T]he mere fact that an officer suspects that contraband may be found in a vehicle does not invalidate an otherwise proper inventory search," id., but "an inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence." Florida v. Wells, 495 U.S. 1, 5 (1990).

Here, while Officer Cassidy may have had suspicions about the possibility of finding marijuana in the vehicle, at the time the decision to search was made, Defendant was in custody and going to jail for driving under the influence. In accordance with departmental policy, his vehicle was required to be inventoried because it would either be towed or turned over to a third party called to the scene.

Turning to the specific arguments raised by Defendant, he asserts that the inventory search policy at issue is "overly broad and explicitly allows officers to conduct an invasive inventory search in literally *any* traffic stop," and that while the policy at least pays lip service to the Supreme Court's decision in Gant, it effectively makes Gant "nugatory, as it allows officers to search any vehicle that has been stopped for any traffic violation." (Docket No. 36 at 8-8, emphasis in original). Under his

reading "Gant no longer exists." (Docket No. 36 at 9).

While the Court agrees that the policy is broadly written and might well be broader than necessary to achieve its goal, the Court disagrees with the contention that the evidence found during the search in this case must be suppressed. The Court reaches that conclusion for several reasons.

First, the Supreme Court in Gant held that, consistent with the Fourth Amendment, police are "authorize[d] to search a vehicle incident to a recent occupant's arrest only when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search." Gant, 556 U.S. at 343. At issue there, however, was the search-incident-to-arrest exception, not an inventory search. In fact, "the Court in Gant did not mention, let alone purport to limit or eliminate the separate exception for inventory searches." Bryant v. DaSilva, 582 F. App'x 56, 57 (2nd Cir. 2014). "To the contrary, Gant expressly hold that where the requirement of the search-incident-to-arrest exception are met, "a search of an arrestee's vehicle will be unreasonable unless police obtain a warrant or show that another exception to the warrant requirement applies." Id. at 57-58 (quoting Gant, 556 U.S. at 351); see also, United States v. Edwards, 769 F.3d 509, 514 (7th Cir. 2014) ("Gant is keyed to the offense of arrest; the automobile exception is not tied to an arrest"). Thus, the fact that the policy may seem to run headlong into the holding of Gant does not, perforce, make it unlawful.

Second, the policy at issue does not appear to be as broad as Defendant claims. While he suggests that the policy would result in a comprehensive search even where an individual is stopped for a faulty tail-light, this does not appear to be the case. Rather, under the Court's reading of the policy, an inventory search will only be conducted when the driver is taken into custody and the vehicle is either going to be impounded or turned over to a third party. It does not apply if the driver

12

is merely warned or ticketed for a traffic offense (which presumably happens more often than not), or if the vehicle is allowed to be left at the scene because, for example, it is parked legally and not presenting a traffic hazard.[8] While Defendant quarrels with the fact that no exception is made for turning over the vehicle to an immediate family member who is called to the scene, the concerns about disputes over lost or stolen property exist regardless of whether the individual given the vehicle is a relative or a towing company. See United States v. Tackett, 486 F.3d 230, 233 (6th Cir. 2007) (upholding inventory search where officer "stated that he would not release personal effects to anyone but a relative or spouse, and even if he did pass a bag to someone, he would inventory it to 'cover myself and the sheriff's department'").

Third, the Court's present concern is not so much with the breadth of the policy as it is the application of the policy in this case. As stated at the outset, "'reasonableness' is 'the ultimate touchstone of the Fourth Amendment'" as its "text makes clear." Fernandez v. California, 134 S. Ct. 1126, 1132 (2014) (quoting, Stuart, 547 U.S. at 403). "Reasonableness, in turn, is measured in objective terms by examining the totality of the circumstances." Ohio v. Robinette, 519 U.S. 33, 39 (1996).

Here, the search was reasonable when viewed in light of the totality of the circumstances. Once Defendant was placed under arrest for driving under the influence, control of his vehicle shifted to the officers on the scene.[9] Leaving the vehicle at the scene was not a reasonable

---

[8] Further, it is not altogether clear, as Defendant maintains, that another licensed driver in the vehicle would not be allowed to drive the vehicle off without there first being an inventory search. The policy conceivably could be read that way, but the Court does not recall any testimony on the issue.

[9] In this regard, the Court rejects Defendant's assertion that the search was unlawful because "the Sixth Circuit has firmly held that '[a] warrantless inventory search may only be conducted if police have lawfully tak[en] custody of a vehicle.'" (Docket No. 36 at 10 quoting United States v. Smith, 510 F.3d 641, 651 (6th Cir. 2007)). When the inventory search was conducted, Defendant's vehicle was in the constructive

13

alternative. The video recording from Officer Cassidy's dash cam shows a large amount of traffic on Vietnam Veterans Boulevard and heavy rain, so a vehicle left on the shoulder presented a traffic hazard. This left either impounding the vehicle and calling a tow truck (which unquestionably would have allowed for an inventory search), or calling someone to come and retrieve the vehicle. Officer Cassidy opted for the later, but she was not constitutionally required to do so. See United States v. Kimes, 246 F.3d 800, 805 (6th Cir. 2001) (while "police sometimes permitted vehicles to be picked up by the driver's friends and relations if they were already present or if the driver could contact them and get them to come to the facility promptly," it was not incumbent upon officers to "take[] it upon themselves to call [defendant's] wife and ask her to get the vehicle"); United States v. Jackson, 682 F.3d 448, 454 (6th Cir. 2012) (relying on Kimes to reject defendant's argument that officers failed to follow a local ordinance and an inventory policy when they did not first contact the owner of the vehicle or the owner of the property on which the vehicle was parked).

Moreover, this Court has already found that the search was conducted pursuant to the police department's inventory search policy, broad or not. "'[I]n conducting an inventory search, officers do not enjoy their accustomed discretion; they are simply following applicable policy.'" Hockenberry, 730 F.3d at 649 (citation omitted). "In other terms, officers are required to follow 'standardized criteria . . . or established routine' to insure that inventory searches are not a 'ruse for a general rummaging in order to discover incriminating evidence.'" Id. at 656 (quoting Wells, 495 U.S. at 4); see also United States v. Cherry, 436 F.3d 769, 776-77 (7th Cir. 2006) (Posner, J. dissenting) (citation omitted) ("Compliance with established procedures is merely a ruse antidote" because "'a locally followed practice gives some sense that a particular car was singled out for

---

(if not actual) custody of Officers Cassidy and Hampton.

special searching attention.'"). Here, Officers Cassidy and Hampton were not "acting in bad faith or for the sole purpose of investigation" id. when they searched Defendant's vehicle.

Defendant's other two-fold argument in relation to the inventory search is more easily dispatched. He argues that, because Officer Cassidy told Officer Hampton to "search good," the search of the vehicle was an investigatory and not an inventory search. However, the Court has already found as a matter of fact that the search was an inventory search pursuant the Hendersonville Policy Department policy.

Defendant also argues that the search was not a true inventory search because Officer Hampton did not complete an inventory log as required by policy. However, "the question is 'not whether the policy was complied with to the T'" because "the law allows some flexibility and practical judgment in how such searches are carried out." Hockenberry 730 F.3d at 661 (citation omitted); see, United States v. Fort, 313 F. App'x 668 (4th Cir. 2009) (citation omitted) ("police are not required to comply with 'all the written directives governing one particular application of the standard procedures for inventory searches,'" especially when dangerous items are discovered); United States v. Shaw, 578 F. App'x 363, 366 (5th Cir. 2014) ("deviations from standard operating procedures [that are] arguable and minor" do not "contravene[] the core constitutional requirements of inventory searches"). Here, once Officer Hampton discovered the incendiary device in the back seat of the vehicle, he quite sensibly backed away and left it to detectives to complete the inventory search and log.

## B. Custodial Interrogation

After Defendant was arrested, handcuffed, and placed in the back of the squad car, he was

15

in custody for purposes of the Fifth Amendment but was not read his Miranda warnings until he was at the police station. Nevertheless, Officer Cassidy asked him a series of questions after the Molotov Cocktails were found; questions that elicited incriminating responses. Those questions were to the effect of "what's in the bottle?"; "what else is there?"; "is there anything illegal?"; "anything in the trunk?"; "what are you doing with the Molotovs – there must be some purpose?"; and "what's up with the mask?".

In Miranda, the Supreme Court held that the constitutional prohibition against self-incrimination requires that suspects be informed of their right to remain silent and their right to have counsel present during questioning prior to undergoing custodial interrogation. But just as there are exceptions to the warrant requirement under the Fourth Amendment, there are exceptions to the requirement that suspects be read Miranda warnings before interrogation.

In New York v. Quarles, 467 U.S. 649 (1984), "the Supreme Court held that 'overriding considerations of public safety' could justify a failure to provide Miranda warnings before initiating custodial interrogation." United States v. Hodge, 714 F.3d 380, 385 (6th Cir. 2013). "Such questioning is permissible when 'officers have a reasonable belief based on articulable facts that they are in danger.'" Id. (quoting United States v. Talley, 275 F.3d 560, 563 (6th Cir. 2001)).

Usually, Quarles is invoked where the dangerous device is a firearm and, in such cases, for the public safety exception to apply, an officer must "have reason to believe (1) that the defendant might have (or recently have had) a weapon, and (2) that someone other than police might gain access to that weapon and inflict harm with it." United States v. Williams, 483 F.3d 425, 428 (6th Cir. 2007). Incendiary devices, however, are different that firearms:

> On its own, the gun does not raise a reasonable threat of danger. But in a case involving a bomb, the presence of third parties who can access the bomb is usually

16

not a compelling consideration. Bombs are potentially unstable and may cause damage if ignored or improperly handled by the police.

Hodge, 714 F.3d at 386.

"The 'public safety' exception applies to a 'situation in which police officers ask questions reasonably prompted by a concern for public safety'" or the safety of the officer. United States v. Kellogg, 306 F. App'x 916, 924 (6th Cir. 2009) (quoting Quarles, 467 U.S. at 655). The "evaluation takes into consideration a number of factors, which may include the known history and characteristics of the suspect, the known facts and circumstances of the alleged crime, and the facts and circumstances confronted by the officer when he undertakes the arrest." Williams, 483 F.3d 425.

At the time that the Molotov Cocktails were discovered, not a lot was known about the Defendant but the officers were faced with a potentially explosive situations and Officer Cassidy's questions, for the most part, were directly related to allaying fears. In any event, the statements that Defendant made were essentially repeated to Detective Brewer after Defendant was Mirandized and waved his right to counsel.

Under Oregon v. Elstad, 470 U.S. 298 (1985), "if an interrogation elicits a voluntary confession but the interrogating officers failed to administer a Miranda warning, subsequent incriminating statements are not necessarily poisoned by the fact that the first confession occurred without a proper Miranda warning." Fleming v. Metrish, 556 F.3d 520, 556 (6th Cir. 2009). The Supreme Court explained:

> It is an unwarranted extension of Miranda to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period. Though Miranda requires that the unwarned

17

admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made.

Elstad, 470 U.S. at 309. Defendant's statements to Officer Cassidy were of his own free will and not the result of any coercion. His statements to Detective Brewer were knowingly and voluntarily made after Defendant acknowledged and waived his Miranda rights.[10]

Finally, Defendant asserts that his statements should be suppressed because of certain statements made by Officer Cassidy and Detective Brewer relating to their observation of him on the night of the arrest and the fact that he was arrested for driving under the influence. Those arguments are unpersuasive.

"The voluntariness of a confession turns on a variety of circumstances, including the length of the interrogation, its location, its continuity, the defendant's maturity, education, physical condition, and mental health, as well as whether the police advised the defendant of his Miranda rights and whether the record contains evidence of police coercion." United States v. Williams, 612 F.3d 417, 420-21 (6th Cir. 2010). Thus, the fact that Defendant was arrested for driving under the influence and that he may have smoked marijuana or drank something at some point prior to the stop does not make his subsequent statements automatically involuntary. See United States v. Montgomery, 621 F.3d 568, 573-74 (6th Cir. 2010) (collecting numerous cases for the proposition that simply being intoxicated or under the influence of a narcotic does not make a confession involuntary). "Drug-induced [or alcohol-induced] impairment . . . . is a matter of degree, making

---

[10] Defendant does not specify the exact statements that he believes should be suppressed, but rather asks that all of his statements given to the officers on the night of his arrest be suppressed. Nevertheless, and in light of the last quoted sentence from Elstad, the Court, at trial, will consider precluding the Government from eliciting specific statements that were made to Officer Cassidy which were prompted by questions that were not directly related to eliminating the officers' concerns about the Molotov Cocktails. Defendant should bring this to the Court's attention, either by way of a motion in limine or before the Government presents Officer Cassidy as a witness.

it appropriate to gauge the impact of drugs on a case-by-case basis and in view of other circumstances at play." Id.

While Officer Cassidy testified that Defendant's eyes were "watery" and "glassy," she also testified that his speech was "not particularly slurred," and that he fully understood the nature of the questions and answered accordingly. And, while Detective Brewer wrote in his report that he thought Defendant was "emotionally disturbed," he meant in the sense that Defendant was "paranoid about government takeovers and conspiracies," (Docket No. 33 at 72), but like Officer Cassidy, believed that Defendant understood what was occurring and he responded appropriately to the questions asked.

Moreover, this Court has independent basis on which to determine Defendant's competence – the video and audio tapes of Defendant's interactions with the police, both on the scene of the accident at the police station. Those tapes clearly show that on the night of December 13, 2013, Defendant was alert and cooperative, able to formulate and respond to questions, and not subject to any coercion. The Court has no hesitation in concluding that Defendant was competent and that his statements were voluntary.

### III. CONCLUSION

On the basis of the foregoing, Defendant's Motion to Suppress Evidence and Statements will be denied. An appropriate Order will be entered.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE